Ms. Hipp. Good morning. May it please the court, counsel. My name is Kelsey Hipp. I represent Mr. Bravo, the appellant in the Instant Appeal. Mr. Bravo raises two issues before the court today. One, that the district court erred by miscalculating Mr. Bravo's criminal history score by including two misdemeanor convictions, where those offenses should have been excluded as similar to one of the enumerated offenses under guideline for a 1.2c. Issue two, that the district court's guideline error affected the selection of the sentence imposed and therefore was not harmless error. To begin with issue one, the probation department assigned zero points to two previous misdemeanor convictions for direct or indirect contact with a street gang member. The probation determined that under the guideline, it was privy to the similar to exception for a 1.2c. Now, in order to determine if a conviction is similar to one of the enumerated offenses under the guideline, application note 12 provides a number of factors for courts to consider. In addition to, this court has consistently held that the goal in determining whether two offenses are similar to each other, it is to determine whether the previous offense is categorically more serious than the enumerated offense under the guideline. So Ms. Hip, let me ask you a question and then I'll get out Judge Rovner's way. First of all, I want to clarify that this is a question of law, not a question of fact. And secondly, I wanted your view on whether this is done at, I'll say, a more abstract level. In other words, not dealing with the particular conduct of the defendant, but instead comparing the offenses just as we do with categorical approaches elsewhere. Yes, Your Honor. This is, application note 12 provides that you can take a number of different factors into consideration, both of which you've mentioned. However, this court has consistently used the elements of the offense and of the two offenses and the ultimate sentence in post, reasoning that the sentencing court is in the best position to understand the seriousness of the previous offense. So, a lot of these factors in application note 12A appear to refer to things that are on the face of the offenses. The punishments imposed between listed and unlisted, well, that seems to me would be a range. Perceived seriousness of the offense is indicated by the level of punishment. That seems legislative, too. The elements of the offense, certainly legislative. Level of culpability involved, that might be more particular to the defendant, but you could comment. And the degree to which there's a likelihood of recidivism may be particular, but I don't want to put words in anybody's mouth. It just seems to me that for our process, whether we are simply looking at street gang conduct as a Class A misdemeanor and comparing it to disorderly conduct with a range from Class C misdemeanor to Class 4 felony, if it's at a more abstract level, then that's one thing. If it's what was this guy doing and what was he charged with and what was his history and all the rest of it might be another issue. I do believe that it is not on such an abstract level. When you're comparing one offense to or when you're comparing an enumerated offense to the one of previous conviction, it is really defendant specific. Here, the underlying conduct for both of the street gang conduct, excuse me, the street gang contact convictions. Mr. Bravo, in the first instance, was riding in a car with, I believe, four other men, this is all available in the PSR, and at least one of which was a Latin King. The car was pulled over for a minor traffic offense. There were no drugs, there were no guns, there was no nefarious activity aside from that simple traffic offense. Therefore, it's our position that the underlying conduct is just, it's not categorically more serious than that of disorderly conduct. For that conviction, he was given time served, two days. That means, and the government has conceded in their briefing, that he was arrested one day and released the next. So if it was a huge concern of the court, it would likely have given a much lower, or excuse me, would have given a much higher sentence and would have revoked his parole. Then for the second offense, it was street gang contact as well, that he was standing in an alley drinking with some individuals, at least some of which were Latin King members. The underlying conduct, of course, was drinking in an alley. That very, it's our position that that very much appears to be like disorderly conduct. I will say that the court also imposed the same sentence, time served, and that was two days arrested and then released the next day. His parole was not revoked on that conviction either. Therefore, that suggests that the seriousness is really fairly low in terms of the sentencing court. Now, I will move on briefly, while reserving some time for Buttle, to the second issue, which is the court's guideline error affected the selection of the sentence it imposed. When sentencing Mr. Bravo, the court started from the high end of the guideline that it determined. That would be a range of 135 to 168. Starting from 168, it subtracted 48 months for time served on a predicate offense and 12 months for his rehabilitative efforts. The court said that yielded a sentence of 109. However, defense counsel noted to the court that that 109 was, the math was incorrect and the district court acknowledged that yes, that math was incorrect and that it was a sentence, it should have been a sentence of 108, which it therefore imposed. So, even though the court at the very end of its sentencing said that it would have imposed the same sentence, irrespective of its decision on the guidelines calculation. It did not provide a reason for that parallel result, nor result, nor did it, nor could it give the court any reassurance that upon remand, it would give the same sentence precisely because of the math and the credit awarded to Mr. Bravo in its calculation of his ultimate sentence. Thank you. Thank you, Miss. Mr. Boyle. Good morning, everyone. Good morning, Your Honors. May it please the court. Patrick Boyle on behalf of the appellant, Mr. Thomas Luzak. We raise, Mr. Luzak raises several issues on appeal here. Central to all of those issues is was the government's decision to charge Mr. Luzak with a special finding, alleging that he was responsible for the 2000 murder of Mr. Juan Serratos. Well, forgive me. Did either the jury or the judge hear any other plausible theory for who murdered Serratos? Well, I mean, unfortunately, there was no question that Mr. Serratos was an active member of another gang. He was involved in violence. Unfortunately, there were probably many people who would have had a motive to have committed this crime. But, you know, we it was essentially a full murder trial was a big part of of Mr. Luzak's trial. The jury heard all of the evidence. This is a case. This is a murder that had been fully investigated by the Chicago police. It was only there was no direct evidence or any physical evidence linking Mr. Luzak to the crime. It was only when individuals who were seeking benefits mentioned Mr. Luzak as a possible perpetrator that the Chicago police even picked up Mr. Luzak. He waived his rights. He was questioned about the homicide. Always denied his involvement. Was actually put in, I think, two lineups where eyewitnesses viewed Mr. Luzak and did not identify him as their shooter. Those eyewitnesses appeared at court. Certainly their testimony did not implicate Mr. Luzak in any way. And interestingly enough, their descriptions directly contradicted the versions that the cooperators ultimately gave that this was some point blank shooting. And I know the government has given explanations why they would have made those claims. But it's fascinating. And again, I don't think it was a close call. The jury heard all the evidence. Heard all the arguments. Realized that the reliable evidence in this case, the physical evidence, the forensic evidence, actually contradicted the claims made by the government cooperators and rightly found Mr. Luzak not guilty of that crime. And it kind of dovetails with all of the issues we raised. Just briefly on the acceptance of responsibility. Mr. Luzak, without that allegation of the special finding of a murder he did not commit, I believe would have promptly pled guilty to count one of the indictment and would have actually received a three-level reduction for acceptance of responsibility. So taking that all together, we do believe that the district court erred in finding by a preponderance that he was responsible for the murder. Again, this is a case fully investigated by the Chicago police. Mr. Luzak wasn't even charged. The probation officer after trial, very experienced probation officer, also looked through everything. Also concluded that she could not hold Mr. Luzak responsible even by the preponderance standard. Did not raise his offense level. Concluded that the fair and appropriate advisory base level was 33. It was only at sentencing that the judge, despite the jury's verdict and not hearing any additional evidence obviously at sentencing, concluded that, well, I am going to hold him responsible for that, which greatly raised his offense level. So Mr. Boyle, apart from your suggestion that we have the power to disregard the Supreme Court's decision in Watts, which I'm going to take as preserving your ability to take this further on, which is fine, you can ask the Supreme Court. Would you concede, though, that you are asking us to find that the district court's preponderance finding reflected clear error? Yes, we do believe it did. And Judge, on the other issue, obviously, a sentencing judge can consider relevant conduct. The issue we raise in our second issue is the idea that I think there's certainly a clear consensus forming with case law and also with the prohibiting punishment of acquitted conduct act that Senator Durbin has reintroduced just this last March. This idea that, of course, you can consider relevant conduct, but when we have acquitted conduct, jury acquitted conduct, that should never be used. It could only be used as mitigation at sentencing. It should never be used as an aggregating factor at sentencing. But you would agree, we don't have the power to change that. That either has to be Congress or the Supreme Court. Yes, Judge. I would reserve. Thank you. Mr. Kerwin. Thank you, Your Honor. Good morning. Good morning. May it please the court. Brian Kerwin on behalf of the United States. Your Honor, the district court correctly calculated appellant Michael Bravo's criminal history score. Street gang contact on parole is not similar to misdemeanor disorderly conduct or disturbing the peace. It's a more serious crime. It's a more culpable crime. And as the district court found consistent with guideline for a 1.2 C. Mr. Bravo's convictions for street gang contact on parole were especially indicative of recurring criminal conduct. But Mr. Kerwin, I mean, I'll go back to the question. I asked Ms. Hipp, some of the factors, at least, under application note 12 capital A, do seem to direct us to the particular circumstances of this defendant, including the level of culpability involved and the degree to which it indicates recidivism. Some of them seem much more generic to the offense. And if you say sitting in a car for which you get a two-day sentence is the same as active disorderly conduct, which involves doing something, disturbing the peace, that's a bold claim, it seems to me. Street gang contact, as it then was, of course it's been changed since then, so we wouldn't even be here for these arrests. Street gang contact doesn't necessarily seem to me to be any worse than disorderly conduct and may be more benign in these facts. A few responses to your questions, both to me, Judge, and to defense counsel. I do agree that the factors set forth in that application note tend to diverge and that some suggest a comparison that's more abstract, as you put it, an element-to-element comparison, a comparison of the potential punishments to the punishment that was handed down in a particular case. The others, I would agree with defense counsel, point in the direction of looking to the underlying conduct here. And I think that's consistent with the purpose of the guideline, which is to take a set of enumerated offenses, misdemeanor offenses, and to look to certain convictions that a defendant has been convicted of and to make a determination as to whether in that particular state or in that particular circumstance that defendant was actually being punished for conduct that's similar to one of the offenses listed in the guideline itself. And so the application note is consistent with the directive to take a common-sense approach to this and determine whether this is really conduct by another name that should or could be criminalized under one of the enumerated offenses. Do you agree that this is a question of law, or is our review on this one de novo? I would agree, Judge, that it's de novo with respect to the legal determination that the judge made, but to get there, she made certain factual findings that were premised on findings that the probation officer had made in the PSR, namely the circumstances of the underlying offense. But I don't see her really being a factual finding. She says, yes, he's just sitting in the car, and then she reflects that, you know, in other circumstances and other times, he was hanging out with those people and doing bad things in the course of that. But do we really want to say sitting in a car is the same as, you know, shooting people up? Well, I think therein lies the difficulty in trying to make an argument that this conduct is similar, which is the question that we're asking, to disorderly conduct. And it's fundamentally different. The elements don't overlap. Does similar have to mean only equal to, or could similar also encompass something that is actually less culpable than one of the enumerated offenses? I think it could be either. But the overall determination is really a question of whether this is conduct that's disorderly conduct by another name. And to your question, Judge, about what the district court considered relevant in Mr. Bravo's underlying conduct, the PSR recited what was in the party's plea agreement and defense counsel, you know, agreed that this was the factual basis that serves as the conduct for that predicate. Mr. Bravo was acting as the driver in a drive-by shooting and precipitated that. When he was arrested for these offenses, it's like you're saying that something else that wasn't on the table was the same as or worse than disorderly conduct. Aren't we obliged to look at these two offenses to see how they affected his criminal history? Absolutely, we are, Judge, but only in the context of what that first offense was, or else you can't determine whether this is indicative of recurring criminal conduct. And it makes it, I'd say, a less thoughtful approach without view of the first instance when you're determining how culpable and serious the conduct was, because here you have an underlying trial judge who's made a determination in that case, based on those facts, that this particular association with these particular individuals poses a likelihood of danger and additional criminal behavior. So in reentering a car with similar individuals just three months after beginning a term of parole, in direct violation of that order, in light of how serious that underlying conduct was, which precipitated the judge's prohibition on it, that shows not only how serious the offense was, but how culpable the individual was who's flagrantly violating the court's order. And because it's Latin kings in the first instance in a car that leads to a drive-by shooting, and Latin kings in a car in the second instance, it speaks to— But there was no drive-by shooting for these misdemeanors that are adding to his criminal history. And I'm just very concerned with the blurring of other conduct, which is certainly culpable conduct, that these particular things—if he'd gotten a parking ticket for being in a particular neighborhood, well, maybe it was a bad neighborhood for him to be in, but it's just a parking ticket. And here he's being told, you violated this condition of your release. That's street gang conduct, for which he gets almost nothing, two days. And why isn't that similarly culpable to disorderly conduct, since he didn't do anything? It's not similar to disorderly conduct, Judge, because the crime itself is the violation of the underlying trial judge's specific order. And when you're specifically directed by a judge to take some action while on parole, the guidelines generally consider actions that are—or crimes, I should say— committed on parole as more serious than crimes that are committed when they're not on parole. And how does the fact that Bravo's misdemeanor street gang conduct demonstrated a propensity for recidivism tip the scales in favor of counting those criminal history points, when every other factor the application notes weigh in favor of excluding the convictions? Is there some authority that you have for weighing the potential for recidivism more heavily than all the other factors? I don't have authority that speaks to that specifically, Judge, but I will comment that every one of the factors in the government's view strongly points in favor of these two misdemeanors being dissimilar. In fact, disorderly conduct disturbing the peace is a Class C misdemeanor in Illinois. The Illinois state legislature has deemed that a crime punishable by only up to 30 days in jail, whereas street gang contact on parole is and always has been a Class A misdemeanor punishable by up to a year. As I alluded to in response to Judge Wood's question, this is a serious offense, even setting aside Mr. Bravo's underlying conduct, because it's necessarily being committed after a judge has imposed a very specific condition in light of circumstances that the judge has deemed to be dangerous vis-à-vis these individuals getting together again. But what authority do you have? You argue that 4A1.2C1 most likely refers to the Class C misdemeanor version of disturbing the peace. But what authority do you have for that, since the disorderly conduct offense has a number of different levels, going all the way up to a Class 4 felony, which you certainly are not arguing his street gang contact offense was? So, Judge, the disorderly conduct statute in Illinois has 12 subparts. Seven of those subparts criminalize felony offenses. And Guideline 4A1.2 says expressly felony offenses always count for guideline purposes. No, of course. And I'm just saying, how do you know that it's the Class C misdemeanor and not a Class A misdemeanor, for instance, which is encompassed within disorderly conduct? Well, I guess the two responses I have to that are street gang contact is, in fact, a Class A misdemeanor. I know that. And I'm saying, why isn't that the same as one of the versions of disorderly conduct, which is also a Class A misdemeanor? Well, because the other four misdemeanors under the disorderly conduct statute criminalize very specific types of activity that bear no resemblance to street gang contact. We're looking at the guidelines, though. The guidelines are written for the entire United States. And we are state by state, offense by offense, trying to figure out what's sufficiently similar. And so I don't know why you can cherry pick out one part of Illinois' disorderly conduct statute and say, well, that's what they really meant. And so we're going to use the one we've chosen for the comparison. I guess I would say, Judge, there's five subparts in Illinois. This is an exercise in determining whether street gang contact on parole is disorderly conduct by another name. And if you look to the disorderly conduct provisions that are misdemeanors in Illinois, the first one generalizes broadly acting unreasonable in disturbing another. The others criminalize very specific acts such as false reporting, nursing home abuse, elder abuse, making a false report to a public safety agency or trespassing onto land to look through someone's window for a lewd purpose. Now, those bear no resemblance under any common sense rubric to violating a court's order not to associate with fellow gang members. So we were we submit to the court that the one to look at is disturbing the peace. It's I would submit a common sense construction of the guideline itself, which lists disorderly conduct or disturbing the peace on the same line. I refer the court to prior rulings that this court has handed down in Staples and Booker, both cases cited by the defendant, both of which only analyzed this comparison under the first subsection for disorderly conduct. The 2018 amendment to the Illinois street gang provisions supports Bravo's argument that his conviction shouldn't be counted in his criminal history, doesn't it? I don't believe it bears any relevance here, Judge, because we're making a comparison between what Mr. Bravo was convicted of and whether that conviction bears a resemblance to one of the misdemeanors enumerated. We have a big problem trying to understand what rationale justifies adding two criminal points, two criminal history points to the guideline range calculation for behavior that's no longer prohibited. It's just a mystery, isn't it? It's not a mystery, Judge, insofar as guideline for a says expressly that every misdemeanor conviction counts as a default rule. The only time a misdemeanor conviction doesn't count is if it falls into one of those two tables in for a one point two and meets the caveats given this. This one does not. And it is not similar to any of those listed. So the guidelines necessarily count them for points. Has no further questions. Bravo. I'll move on to Mr. Luzak and submit that the court committed no clear error in its factual findings or in its decision regarding acceptance of responsibility. The court presided over six weeks of trial and heard evidence and testimony from numerous witnesses that supported the finding that Mr. Luzak committed a first degree murder. If we discounted Salazar's testimony is unreliable. Exactly what evidence would be left? The evidence that Luzak shot Serrano. Well, the Mr. Salazar's testimony, as your honor is alluding to, was a central piece of the government's case regarding the murder. But his testimony was corroborated in a handful of other ways. His testimony about the type of firearm that was used was corroborated by a ballistics expert. His testimony about where Mr. Serrano was shot was corroborated by the medical examiner. Another member of the Latin King Street gang testified as to Mr. Luzak's confession to him about having committed the murder. There was testimony about the motives that Mr. Luzak had to murder him. Not only a personal motive, but a motive that had come from the regional leadership in the gang who directed members of the Latin Kings, if given the opportunity to commit this murder. The judge also commented on the spontaneous nature of a post-arrest interview that was played for the jury by defense counsel that corroborated the same testimony that he gave to the jury. Thank you, Mr. Kerwin. Thank you, your honors. Unless the panel has any further questions, I'd ask the court affirm the sentences imposed by the district court. Ms. Hitt? Ms. Hitt? Yes, your honor. I believe I have 30 minutes for rebuttal. I just have a few points. One, the government mistakes the overall goal in determining the similarity between the offenses. The goal is whether the committed offense is categorically more serious. Number two, if you take a look at Garrett, which this court previously decided, it states that bail jumping is similar to contempt of court. Now, bail jumping is precisely the same kind of expressed condition as not having street gang conduct. That is, you know, don't do it. And finally, if you take a look at Locke that this court previously decided, it instructs courts to look at the entire statute. In that case, it was the loitering statute and not just, as you mentioned, your honor, cherry-picking subsections from a statute. That'll be all. Thank you, Ms. Hitt. Mr. Boyle? Thank you, judges. Just very briefly, this idea that there was a spontaneous statement implicating Mr. Luzak, that statement was made 15 years after the murder. There would have been many reasons other than a direct admission by Mr. Luzak that why this individual making these claims would have known about the gun that could have been used.  The evidence was extremely weak implicating Mr. Luzak. Without that testimony by that cooperator who had every motive under the sun to lie, it would not have met even a preponderance level. Unfortunately, the sentencing judge did commit clear error in usurping the jury's verdict and greatly increasing the offense level. And the idea that I would sentence an individual who I believe murdered someone in cold blood the same way I would have sentenced Mr. Luzak, an aging rank and file gang member, just defies logic and common sense. And it created an unfair sentencing disparity. So, thank you. Judge Keeney, Mr. Boyle had reserved the rest of the time that he didn't use in his original argument but was not given that extra time. Is that correct, Mr. Boyle? I think I might have been shortchanged about a minute. So, if your honors have any questions for me, I would be happy to take them. But I appreciate the additional time. Again, I think, you know, again, all these things dovetail. He would not have gone to trial without the government's allegation of the special finding. This is not like a defendant who went to court to challenge a count of an indictment. This was a special finding contained within a count. So, it is different. He is deserving of acceptance. And the jury's verdict supported that decision. So, you're taking all of these things together. The sentence without the murder, which should not have been found even by a preponderance. The sentence of 210 months, which is maxing him out as if it was a level 33. It just makes no sense considering the specific characteristics of Mr. Luzak. So, thank you very much. Okay. Thank you, Mr. Boyle. Thanks to Judge Roper for pointing out you had additional time. With that, the case will be taken under advisement.